UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CORRY G. NIX,

               Plaintiff,

     -vs-

THE CITY OF ROCHESTER, ROCHESTER
CITY POLICE DEPARTMENT, ROCHESTER
CITY POLICE OFFICER MICHAEL
JOHNSON, MICHELLE BROWN, EBONY
ARTCHETCKO, FRYE, RIVERA, WALDO and
JOHN DOE(s), intended to be another
Rochester City Police Officer(s)
whose name(s) is/are not Known to
the Plaintiff, and NELSON
JUSTIANO-DEJESUS,

               Defendants.

_____

**DECISION and ORDER**
**No. 6:14-cv-06395(MAT)**

## I. Introduction

Represented by counsel, Corry G. Nix ("Nix" or "Plaintiff"), instituted this action against the City of Rochester ("the City"), the Rochester Police Department ("RPD"), various named RPD officers (Ebony Archetko, Michelle Brown, Thomas Frye, Michael Johnson, Rafael Rivera, and Richard Waldo), and one or more unnamed RPD officers (collectively, "the City Defendants"), and Nelson Justiano-DeJesus ("Justiano-DeJesus"), a private citizen, alleging violations of his constitutional rights under 42 U.S.C. § 1983, as well as state law causes of action sounding in tort.

## II. Factual Background

Unless otherwise noted, the following facts are undisputed.

On the morning of July 16, 2013, Plaintiff drove his wife's red Chevy truck, bearing NYS license plate number FAM 3482, to 127-129 Anthony Street in the City of Rochester. His daughter, Shana Nix ("Shana") lived at this address, a duplex residence, with her infant daughter. Shana had called Plaintiff for help regarding trouble with her neighbor, co-defendant Justiano-DeJesus, who resided with his family on the other side of the duplex. Shana believed that someone had broken into her apartment and had taken some items. Upon seeing what she believed were similar items in the possession of Justiano-DeJesus's family, Shana called 911 to make a report. Shana also personally spoke to the Justiano-DeJesus family about her concerns.

When Plaintiff arrived at 127-129 Anthony Street, he confronted Justiano-DeJesus and his family. During his deposition, Plaintiff admitted,

> And then I was telling the guy–the older gentleman–I forgot his name but it wasn't Nelson Justiano. He had some people living with him. The older guy, he came out. And I was asking him did you guys break in to my daughter's house and whatnot. And I was telling him to call the police, there is going to be a price to pay if you got stolen goods.

(Deposition of Corry Grandel Nix ("Nix Dep.") at 36:7-14 (Dkt #13-2, p. 21 of 64), Exhibit ("Ex.") B to Declaration of Christopher Noone, Esq. ("Noone Decl.")).

Plaintiff's argument with Justiano-DeJesus and his family escalated. At approximately 9:56 a.m., a bystander called 911 and

reported that "things are getting heated - F's [sic] father has arrived on scene and poss [sic] fight to start." (911 Transcript (Dkt #13-2, p. 54 of 64, Ex. D to Noone Decl.); capitals omitted). Plaintiff then departed in the red Chevy truck. Justiano-DeJesus called 911 to report what he perceived to be threats by Plaintiff against him and his family,[1] describing what Plaintiff was wearing, the vehicle he was driving, the license plate number, and the direction in which he last saw Plaintiff headed.

Defendant RPD Officer Michelle Brown ("Officer Brown") was on duty and assigned to the neighborhood where 127-129 Anthony Street was located. Upon hearing  the "man with a gun" dispatch call, Officer Brown drove her marked patrol car to the area noted. En route, she encountered Plaintiff driving in the opposite direction on Post Avenue. Officer Brown drove her vehicle across his path, and pulled to a stop. Immediately after Plaintiff stopped his vehicle, Officer Brown got out of her car, drew her service sidearm, pointed it at Plaintiff, and ordered him to keep his hands in sight and to get out of the truck.

Defendant Officer Ebony Archetko ("Officer Archetko") was also in uniform and on duty that morning, was assigned to the same patrol area as Officer Brown. She was driving her marked patrol car

---

[1]

Justiano-DeJesus reported to the 911 operator that an "unknown black male in a long-sleeved white t-shirt" was "outside threatening him w/a gun" and that the "susp[ect] came in a red truck[.]" (Id., p. 55 of 64); see also id. ("comp[lainant] having prob[lem] w/ male [neighbor] – threatened to shoot comp[lainant] – no weapons seen[.]").

when she heard the "man with a gun" dispatch call. Officer Archetko proceeded to Post Avenue, pulled in behind Plaintiff's truck and got out of her vehicle with her service sidearm drawn. Just after Officer Archetko arrived, Defendant RPD Officer Thomas Frye ("Officer Frye") pulled up in his marked patrol vehicle in response to "man with a gun" dispatch. Defendant Sergeant (now Lieutenant) Richard Waldo ("Sergeant Waldo") also responded to the "man with a gun" dispatch.

Plaintiff did not immediately exit his car, as requested by Officer Brown, instead demanding to know why he had been stopped at gunpoint. Officer Brown advised him that she would explain as soon as he complied with her direction, and she offered to have the 911 call played back over her radio. Plaintiff eventually got out of his vehicle by himself. Officers Brown and Archetko holstered their sidearms and began handcuffing him. Plaintiff protested that he had a metal plate in his back, due to previous injuries, that made it very uncomfortable for him to have his hands cuffed behind his back with his wrists together. Officers Brown, Archetko, Frye and Sergeant Waldo used two sets of handcuffs joined end-to-end, to provide more distance between Plaintiff's wrists.

After Plaintiff was handcuffed, Officer Brown called dispatch to have the "man with a gun" 911 call played back. At deposition, Plaintiff testified that upon hearing it, he was able to "totally

understand" why he was stopped at gunpoint by Officers Brown and Archetko.

While the police investigated the two scenes at issue in the incident involving Shana, Plaintiff, and Justiano-DeJesus, Plaintiff was offered the option of sitting in the back of a patrol car or standing next to it, or sitting at curbside, whichever was more comfortable for him. Plaintiff opted to sit on the curb.

Subsequently, Officer Frye transported Plaintiff to booking, at which time he was charged with second-degree harassment. Plaintiff did not request medical attention at any time. When he was given the opportunity to see a nurse at the booking office, he declined.

Plaintiff and Shana were both arrested on July 16, 2013. When they appeared in court on July 17, 2013, they were advised that Justiano-DeJesus had obtained "no contact" orders of protection against both of them. Plaintiff's attorney advised him that this meant he was to have no contact with Justiano-DeJesus, his premises, or his property. Plaintiff was offered an adjournment in contemplation of dismissal ("ACD"), but declined it. (Nix Dep. at 90:20-22 (Dkt #13-2, p. 38 of 64)).

On the morning of July 18, 2013, Shana returned to the Anthony Street duplex to pick up some clothing for herself and her baby. At the time, she encountered Justiano-DeJesus, who chased her into the house while brandishing a knife. Shana called 911 to report this. She also called Plaintiff to ask for his assistance. Plaintiff and

his wife drove her red truck to the Anthony Street duplex in response to Shana's phone call.

Meanwhile, Officer Brown, along with RPD Officer Michael Johnson ("Officer Johnson") and RPD Officer Rafael Rivera ("Officer Rivera") were already on the scene. Officer Brown was attempting to resolve the dispute between Shana and Justiano-DeJesus and convince him not to press charges against Shana for violating the "no contact" order of protection.

When Plaintiff arrived, he got out of the truck, at which point Officers Brown, Johnson and Rivera ordered him to get back into the vehicle or wait somewhere farther down the street while they handled the situation. According to the officers, Plaintiff got into and out of his wife's vehicle several times; each time he was directed to get back into the vehicle and to avoid having any contact with Justiano-DeJesus or his family.

At some point, Plaintiff got out of the vehicle and began recording Justiano-DeJesus, who was on the porch of the Anthony Street duplex, with his cell phone camera. Plaintiff admits video-recording someone, but asserts that the person's "identity was unknown[.]" (Plaintiff's Rule 56 Statement (Dkt #16-2), ¶ 34). Officer Johnson then advised Plaintiff he was under arrest for violating the order of protection.

Upon being informed by Officer Brown of Plaintiff's physical condition, Officer Johnson used three sets of handcuffs, joined

end-to-end, to restrain Plaintiff's hands behind his back. Plaintiff was placed in the back of Officer Rivera's patrol car to be transported to booking, where he was charged with second-degree criminal contempt. Plaintiff did not request medical attention at any time and, when he was given the opportunity to see a nurse at the booking office, he declined.

Plaintiff appeared in court on July 19, 2013, and was offered an ACD with regard to the contempt charge. However, he declined it. At a subsequent court appearance, the prosecutor withdrew both the second-degree harassment and second-degree criminal contempt charges. (Nix Dep. at 91 (Dkt #13-2, p. 39 of 64)).

## III.  Procedural History

Plaintiff's Complaint, filed on July 17, 2014, alleges eleven causes of action. Summonses were issued as to all named defendants on July 18, 2014. On October 22, 2014, the City Defendants filed an Answer to the Complaint.[2] On April 28, 2017, the City Defendants filed the instant Motion for Summary Judgment. Plaintiff filed opposition papers on July 1, 2017. The City Defendants filed reply papers on July 12, 2017.

For the reasons discussed herein, the City Defendants' Motion for Summary Judgment is granted. In addition, the Court sua sponte dismisses the sole cause of action against Justiano-DeJesus.

---

[2]

Justiano-DeJesus, who is only named in the Tenth Cause of Action, did not file an Answer or otherwise appear in this action. The City Defendants indicate that believe he has been deported.

**IV.   Summary Judgment Standard**

Summary judgment should be granted when there is no genuine dispute as to any material fact, and the moving party demonstrates entitlement to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(a). The party moving for summary judgment initially bears the burden of demonstrating the absence of a genuine issue of material fact. <u>Adickes v. S.H. Kress and Co.</u>, 398 U.S. 144, 157 (1970). The non-movant then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), which requires "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). In determining whether there is a genuine issue of material fact requiring trial, the court is "'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" <u>Johnson v. Killian</u>, 680 F.3d 234, 236 (2d Cir. 2012) (quoting <u>Terry v. Ashcroft</u>, 336 F.3d 128, 137 (2d Cir. 2003); internal quotation marks omitted in original). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quotation omitted).

**V.    Discussion**

**A.    Assault and Battery (First, Second, Third, and Fourth Causes of Action)**

In the First and Third Causes of Action in his Complaint, Plaintiff asserts that on the morning of July 16, 2013, Officers Brown, Archetko and Frye assaulted him by intentionally placing him in imminent fear of forceful, harmful contact without his consent, and then intentionally subjected him to harmful and offensive contact by allegedly grabbing him, forcing his arms behind his back, handcuffing him, and subduing him. In the Second and Fourth Causes of Action, he makes the same allegations against Officers Johnson, Brown, and Rivera and Sergeant Waldo regarding the events of the morning of July 18, 2013.

"[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery] claims . . . [are] substantially identical." Posr v. Doherty, 944 F.2d 91, 94-95 (2d Cir. 1991) (citation omitted); see also Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) (claims against officers for assault and battery under state law "correspond[ed]" to claims asserting Fourth Amendment violations). "To succeed on a Fourth Amendment excessive force claim, a plaintiff must show that the amount of force used was 'objectively unreasonable.'" Lowth, 82 F.3d at 573 (quoting Finnegan v. Fountain, 915 F.2d 817, 821, 823 (2d Cir. 1990)). In making this determination, the court "must

consider the perspective of the officer at the time of the arrest, taking into account the fact that the officer may have been required to make a split-second decision." Id. (citing Graham v. Connor, 490 U.S. 386, 397 (1989) ("As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.")).

### 1.   The July 16, 2013 Incident

This incident involved Officers Brown, Archetko and Frye. As noted above, Officers Brown and Archetko pulled Plaintiff over in response to the "man with a gun" 911 dispatch. When Plaintiff got out of his truck, Officers Brown and Archetko initially attempted to place a single set of handcuffs him. However, as soon as he advised them that he had a physical condition that made it too painful and uncomfortable to have has hand secured in that manner, the officers joined two sets of handcuffs end-to-end to provide additional distance between his wrists.

"[W]ith respect to an excessive force claim based on the use of handcuffs, courts evaluate the reasonableness of the force used in light of the following factors: (1) whether the handcuffs were unreasonably tight; (2) whether the defendants ignored pleas that the handcuffs were too tight; and (3) the degree of injury to the

wrists." <u>Mayes v. Vill. of Hoosick Falls</u>, 162 F. Supp.3d 67, 88 (N.D.N.Y. 2016) (citing, <u>inter alia</u>, <u>Lynch ex rel. Lynch v. City of Mount Vernon</u>, 567 F. Supp.2d 459, 468 (S.D.N.Y. 2008)). "This particularized standard reflects the need to balance the 'right to use some degree of coercion,' including the use of tight handcuffs 'to prevent the arrestee's hands from slipping out,' <u>Esmont v. City of N.Y.</u>, 371 F. Supp.2d 202, 214 (E.D.N.Y. 2005) (internal citation omitted), with the use of 'overly tight handcuffing' that could constitute excessive force[.]" <u>Dunkelberger v. Dunkelberger</u>, No. 14-CV-3877 KMK, 2015 WL 5730605, at *14 (S.D.N.Y. Sept. 30, 2015) (citing <u>Lynch</u>, 567 F. Supp.2d at 468).

Here, none of the three foregoing factors favor Plaintiff. The RPD officers did not "ignore[ ] pleas that the handcuffs were too tight[,]" <u>Mayes</u>, 162 F. Supp.3d at 88. Instead, in response to Plaintiff's assertions of discomfort, they attempted to accommodate him by joining two sets of handcuffs together, end-to-end, so as to provide more space between Plaintiff's wrists. The fact that two sets of handcuffs were used fatally undermines his claim that the handcuffs "were unreasonably tight[,]" <u>Mayes</u>, 162 F. Supp.3d at 88. Plaintiff asserts that this use of two sets of handcuffs "wasn't accommodating [him]" because he "was still in pain." (Deposition of Corry Nix at 15:7-15 (Dkt #13-3), Ex. J to Noone Decl.).[3] However,

---

[3]
    It appears that this deposition was conducted as part of the RPD's administrative investigation into Plaintiff's complaint against the officers.

he does not allege any injury as a result of the handcuffing, and he has admitted that he "never asked for any medical attention." (Id.). "There is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." Lynch, 567 F. Supp.2d at 468 (collecting cases).

There is no evidence that the handcuffing on July 16, 2013, injured Plaintiff, and he does not claim any consequences flowing from the handcuffing apart from temporary discomfort. The Court finds that, as a matter of law, Officers Brown, Archetko, and Frye did not use excessive force in handcuffing Plaintiff on July 16, 2013.

### 2.    The July 18, 2013 Incident

According to Plaintiff's own testimony, only Officer Johnson was involved in the application of handcuffs when he was arrested on July 18, 2013. It is undisputed that Officer Johnson was informed by Officer Brown of Plaintiff's physical impairments which prevented use of a single set of handcuffs. Officer Johnson therefore joined three sets of handcuffs together, end to end, to provide additional distance between Plaintiff's wrists. It is also undisputed that Plaintiff not request medical attention on July 18, 2013, from Officer Johnson or any of the other defendants. When he had the opportunity to see a nurse in the booking office, he did not do so because he had posted bail and instead opted to leave.

Again, there is no evidence that the handcuffing on July 18, 2013, injured Plaintiff, and he does not claim any consequences flowing from the handcuffing apart from temporary discomfort. The Court finds that, as a matter of law, Officer Johnson did not use excessive force in handcuffing Plaintiff on July 18, 2013.

**B.  False Arrest and False Imprisonment (Fifth and Sixth Causes of Action)**

In his Fifth and Sixth Causes of Action, Plaintiff alleges that he was falsely arrested and falsely imprisoned on July 16, 2013, and July 18, 2013, respectively.

The Second Circuit has explained that "[t]he common law tort of false arrest is a species of false imprisonment[,]" Singer, 63 F.3d at 118; see also Budgar v. State, 414 N.Y.S.2d 463, 466 (Ct. Cl. 1979) ("The tort of false arrest is essentially the same as the tort of false imprisonment, and every false arrest is itself a false imprisonment, with the imprisonment commencing with the arrest.") (internal and other citations omitted). "Under New York law, the elements of a false imprisonment claim are: '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" Singer, 63 F.3d at 118 (quoting Broughton v. State, 373 N.Y.S.2d 87, 93 (1975)). "There can be no federal civil rights claim for false arrest where the arresting officer had probable cause." Singer, 63 F.3d at 118 (citation omitted).

-13-

## 1.  The July 16, 2013 Incident

On July 16, 2016, defendant Justiano-DeJesus, made a 911 call reporting that Plaintiff threatened to shoot him with a gun. Justiano-DeJesus described Plaintiff to the 911 operator, as well as the make, model, and license plate number of Plaintiff's truck, and the direction in which he was last seen traveling. Justiano-DeJesus later swore out a complaint charging Plaintiff with a violation of Harassment in the Second Degree under New York Penal Law ("P.L.") § 240.26(1)). The complaint alleged that Plaintiff said to Justiano-DeJesus, "'I'm gonna shoot you up' and 'I'm gonna get you[,]'" which "cause[d] [him] to feel threatened and alarmed." (Dkt #13-3, p. 7 of 45).

Defendants argue that Officers Archetko and Brown had probable cause to arrest Plaintiff for second-degree harassment based on Justiano-DeJesus's 911 call, the accurate description of Plaintiff, Plaintiff's vehicle and its license plate number, and the direction Plaintiff was traveling when last seen. Defendants argue that although no gun was found on his person or in his truck, his admission to Officer Archetko[4] supported his arrest and the charge of second-degree harassment.

An officer has probable cause to make an arrest when he or she has "knowledge or reasonably trustworthy information of facts and

---

[4] Officer Archetko testified that Plaintiff "actually admitted to [her] that he threaten to shoot" Justiano-DeJesus. (Deposition of Ebony Archetko at 7-8 (Dkt #13-3), Ex. H to Noone Decl.).

circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." <u>Davis v. Rodriquez</u>, 364 F.3d 424, 433 (2d Cir. 2004). The Second Circuit has "found probable cause where a police officer was presented with different stories from an alleged victim and the arrestee." <u>Curley v. Vill. of Suffern</u>, 268 F.3d 65, 70 (2d Cir. 2001) (citation omitted). "Probable cause to arrest may exist even if the arresting officers do not possess firsthand knowledge of the suspect's alleged criminal activity." <u>Watkins v. Ruscitto</u>, No. 14 CIV. 7504 (AJP), 2016 WL 3748498, at *6 (S.D.N.Y. July 11, 2016) (citing <u>Zellner v. Summerlin</u>, 494 F.3d 344, 369 (2d Cir. 2007) ("The existence of probable cause need not be assessed on the basis of the knowledge of a single officer.")).

Here, Officer Brown heard the 911 dispatch based on the call made by Justiano-DeJesus regarding Plaintiff's alleged threats. During the course of the traffic stop minutes later, Officer Archetko testified that while Plaintiff maintained he did not have a gun, he did admit to telling Justiano he was going to get a gun and shoot him. (<u>See</u> Archetko Dep. at 7-8 (Dkt #13-3), Ex. H to Noone Decl.). The Court finds that the officers had "reasonably trustworthy information of facts and circumstances" sufficient to warrant their belief that Plaintiff in fact had committed the crime of second-degree harassment.

The Court notes, however, that the fact that the arrest was made based on conduct committed outside of the officers' presence raises an issue of New York State law that has been treated differently by district courts in this Circuit. Second-degree harassment is only a violation under New York Penal Law. <u>See</u> N.Y. Penal Law § 240.26 ("Harassment in the second degree is a violation."); <u>id.</u> § 10.00(3) ("'Violation' means an offense, other than a 'traffic infraction,' for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed."). As a matter of New York Criminal Procedure Law police officers are not authorized to make a warrantless arrest for a violation unless the officer has "reasonable cause" to believe the violation has occurred in their presence. <u>See</u> N.Y. Crim. Proc. Law § 140.10(1)(a) ("[A] police officer may arrest a person for . . . [a]ny offense when he or she has reasonable cause to believe that such person has committed such offense *in his or her presence*[.]") (emphasis supplied). Most of the district courts in this Circuit have found the rule embodied in N.Y. Crim. Proc. Law § 140.10 to be inapplicable in the context of a § 1983 false arrest claim. <u>Mikulec v. Town of Cheektowaga</u>, 909 F. Supp.2d 214, 225 (W.D.N.Y. 2012) (collecting cases).[5] In <u>Hotaling v. LaPlante</u>, 167 F. Supp.2d 517,

_____

[5]

See <u>also</u>, <u>e.g.</u>, <u>Cooper v. California</u>, 386 U.S. 58, 61 (1967) (whether a seizure is reasonable under the Fourth Amendment is a different question than whether a seizure is authorized by state law); <u>United States v. Becerra-Garcia</u>, 397 F.3d 1167, 1174 (9th Cir. 2005) ("[W]e . . . have declined to consider state law in determining the reasonableness of seizures [under the Fourth

522 (N.D.N.Y. 2001), for instance, the plaintiff argued that his arrest for second-degree harassment under N.Y. Penal Law § 240.26(1) violated his Fourth Amendment rights because it was effected in violation of N.Y. Crim. Proc. Law § 140.10(1). The district court rejected this argument, explaining that

> [t]here is no requirement under the Fourth Amendment that a police officer personally witness the conduct upon which he or she relies to establish the existence of probable cause. In considering a plaintiff's claims under Section 1983, "[t]he question is whether there has been a violation of a federal right, which here is claimed to be the Fourth Amendment."

Hotaling, 167 F. Supp.2d at 522-23 (internal citations and quotation omitted; brackets in original). As the district court in another case relying on Hotaling observed, it is well settled that "[a] violation of a state law, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." Williams v. Schultz, No. 9:06-CV-1104, 2008 WL 4635383, at *8 & n. 49 (N.D.N.Y. Oct. 16, 2008) (emphasis omitted). This is an action under 42 U.S.C. § 1983, and, as such, it is governed by the Federal Constitution (e.g., the Fourth Amendment) and an Act of Congress (i.e., 42 U.S.C. § 1983). Therefore, the substantive law to be applied is not the substantive law of New York State. Williams, 2008 WL 4635383, at *9. "While it

_____

Amendment]."); United States v. Smith, 9 F.3d 1007, 1014 (2d Cir. 1993) (validity of search in federal prosecution is whether federal, not state, constitution is satisfied); Fields v. City of South Houston, 922 F.2d 1183, 1189 (5th Cir. 1991) ("[A] civil rights action [under 42 U.S.C. § 1983] will not lie for a warrantless misdemeanor arrest in violation of state law."); Street v. Surdyka, 492 F.2d 368, 371 (4th Cir. 1974) ("Even if [the plaintiff] violated Maryland arrest law, he cannot be liable under section 1983 unless he also violated the federal constitutional law governing warrantless arrests.").

is true that federal courts addressing a false arrest claim asserted against a state official under the Fourth Amendment 'look to' a state's substantive law to define the elements of a false arrest claim (and the elements of the crime for which the plaintiff was arrested), ultimately the substantive law that is being applied is the Fourth Amendment of the United States Constitution." Id. at n.51 (citing Russo v. City of Bridgeport, 479 F.3d 196, 203 (2d Cir. 2007) (stating that court was "look[ing] to" the state's substantive criminal law to analyze plaintiff's false arrest claim, but that the claim was "arising under the Fourth and Fourteenth Amendments") (quotation and citation omitted)).

The Court finds the reasoning of cases such as Hotaling and Williams to be persuasive. Because Officers Brown and Archetko did have a sufficient factual basis to conclude that probable cause existed for the arrest of Plaintiff for second-degree harassment, the mere fact that they did not personally witness the alleged conduct and may have acted in violation of a state procedural law is not sufficient to establish a violation of the Fourth Amendment of the United States Constitution. Hotaling, 167 F. Supp.2d at 523. Accordingly, because the officers had probable cause to arrest Plaintiff, and because the arrest was not otherwise constitutionally invalid, the City Defendants' motion for summary judgment must be granted as to this cause of action. Id.

## C.    Malicious Prosecution (Eighth, Ninth and Tenth Causes of Action)

Plaintiff's Eighth and Ninth Causes of Action assert claims of malicious prosecution against the City Defendants with regard to the July 16, 2013, and July 18, 2013, incidents, respectively. Plaintiff's Tenth Cause of Action asserts a claim of malicious prosecution against Jusintiano-DeJesus with regard to the incident on July 16, 2013.

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law[.]" Manganiello v. City of N.Y., 612 F.3d 149, 160–61 (2d Cir. 2010) (internal and other citations omitted). "Under New York law, a plaintiff suing for malicious prosecution must establish: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995) (citation omitted). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003) (citation omitted). "Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to

believe the plaintiff guilty." <u>Boyd v. City of N.Y.</u>, 336 F.3d 72, 76 (2d Cir. 2003) (citation and footnote omitted).

Although probable cause must exist at the time a criminal proceeding is initiated—and not only at the time of arrest—in order to be a complete defense to a malicious prosecution claim, "*in the absence of exculpatory facts which became known after an arrest*, probable cause to arrest is a complete defense to a claim of malicious prosecution." <u>D'Angelo v. Kirschner</u>, 288 Fed. Appx. 724, 726 (2d Cir. 2008) (summary order) (emphasis supplied); <u>see</u> <u>also</u> <u>Smith v. City of N.Y.</u>, 04 Civ. 3286, 2010 WL 3397683 at *9 (S.D.N.Y. Aug. 27, 2010) ("Once probable cause to arrest is established, a claim for malicious prosecution is barred 'unless plaintiff can demonstrate that at some point subsequent to the arrest, additional facts came to light that negated probable cause.'") (quoting <u>Dukes v. City of N.Y.</u>, 879 F. Supp. 335, 342 (S.D.N.Y. 1995) (citing <u>Oakley v. City of Rochester</u>, 421 N.Y.S.2d 472, 474 (4th Dep't 1979)).

As discussed above, this Court has found that there was probable cause for Plaintiff's arrest. In these circumstances, and "'[i]n the absence of some indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest, no claim for malicious prosecution may lie.'" <u>Rae v. Cty. of Suffolk</u>, 693 F. Supp.2d 217, 226 (E.D.N.Y.

2010) (quotation and citations omitted). In response to the City Defendants' summary judgment motion, Plaintiff has come forward with no facts to suggest that the RPD officers became aware of any exculpatory evidence between the time of the arrest and the subsequent prosecution that undermined the probable cause supporting Plaintiff's arrest. Indeed, none are discernable on the record. Therefore, the probable cause that existed to arrest Plaintiff serves as a complete defense to his claim of malicious prosecution. See, e.g., Williams v. City of N.Y., 02 Civ. 3693, 2003 WL 22434151 at *6 (S.D.N.Y. Oct. 23, 2003) ("Because there was probable cause to arrest plaintiff, and plaintiff has not introduced evidence to suggest that the defendants had different information available to them between the time of [plaintiff's] arrest and his grand jury indictment, defendants had probable cause to prosecute plaintiff . . . ."), aff'd, 120 Fed. Appx. 388 (2d Cir. 2005) (summary order); Jouthe v. City of N.Y., No. 05-CV-1374, 2009 WL 701110 at *12 (E.D.N.Y. Mar. 10, 2009) ("Courts in this circuit have found that '[a]bsent new countervailing facts, probable cause for arrest establishes probable cause for prosecution.'") (quoting Harper v. Port Auth., No. 05-CV-5534(BSJ), 2009 WL 398127, at *4 (S.D.N.Y. Feb. 19, 2002); citing Espada v. Schneider, 522 F. Supp.2d 544, 553 (S.D.N.Y. 2007))..

Since there is no dispute of material fact as to whether the City Defendants and Justiano-DeJesus had probable cause to

institute criminal proceedings against Plaintiff, and since probable cause is a complete defense to a claim of malicious prosecution, the Court does not reach the other elements of Plaintiff's malicious prosecution claims. See, e.g., Sullivan v. LaPlante, No. 03-CV-359, 2005 WL 1972555, at *8 & n. 17 (N.D.N.Y. Aug. 16, 2005) (granting summary judgment as to malicious prosecution claim because "probable cause is a complete defense[;]" court "[did] not reach the parties' arguments on the favorable termination and malice elements of the claim for malicious prosecution"). Accordingly, the Eighth, Ninth, and Tenth Causes of Action fail as a matter of law.

### D. Negligent Hiring, Training, and Supervision by the RPD and the City (Seventh Cause of Action) and Municipal Liability (Eleventh Cause of Action)

In his Seventh Cause of Action, Plaintiff alleges that the City and the RPD, jointly and severally, failed to exercise due care in the hiring, supervision, and training of police personnel with respect to the proper treatment of suspects and persons in custody, and the use of physical force.

#### 1. The Claims Against the RPD Are Redundant

"[M]unicipalities and other local government units" are "included among those persons to whom § 1983 applies." Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978) (footnote omitted). "Under New York law, a city is a municipal corporation capable of bringing suit and being sued." Reinhart v. City of

-22-

<u>Schenectady Police Dep't</u>, 599 F. Supp.2d 323, 325 n. 4 (N.D.N.Y. 2009) (citing N.Y. Gen. Mun. Law § 2). "A police department is an administrative arm of the municipal corporation." <u>Baker v. Willett</u>, 42 F. Supp.2d 192, 198 (N.D.N.Y. 1999) (citation omitted). Because "it does not exist separate and apart from the municipality and does not have its own legal identity," a police department "cannot sue or be sued[.]" <u>Id.</u>; <u>accord</u>, <u>e.g.</u>, <u>Loria v. Town of Irondequoit</u>, 775 F. Supp. 599, 606 (W.D.N.Y. 1990); <u>East Coast Novelty Co. v. City of N.Y.</u>, 781 F. Supp. 999, 1010 (S.D.N.Y. 1992)). The RPD has no legal identity separate and apart from the City of Rochester. Therefore, Plaintiff's <u>Monell</u> claims against the RPD are dismissed as redundant of his <u>Monell</u> claims against the City. <u>See</u> <u>Baker</u>, 42 F. Supp.2d at 198 (citing <u>Curran v. City of Boston</u>, 777 F. Supp. 116 (D. Mass. 1991)).

### 2.    The Claims Against the City Fail as a Matter of Law

Under the standards set forth in <u>Monell</u>, 436 U.S. 658, "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." <u>Jones v. Town of E. Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012) (citing <u>Monell</u>, 436 U.S. at 690; <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011) (municipalities can be held liable for "practices so persistent and widespread as to practically have the force of

law")). Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee." Id. (citing Monell, 436 U.S. at 691; Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 404 (1997) ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."); other citation omitted).

As an initial matter, the plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985) (internal citation omitted). Plaintiff's Complaint merely contains boilerplate allegations of unconstitutional policies and practices. For instance, Plaintiff alleges that the City and the RPD, "through its [sic] agents, servants, employees and officers, as a matter of official policy through its [sic] actions and inactions deliberately and/or recklessly authorized and permitted Defendant Officers Michael Johnson, Michelle Brown, Ebony Artchetcko, Frye, Rivera, Waldo and other Rochester City Police Officers, to disregard and violate" Plaintiff's rights, and "permitted them to do so out of personal animosity through malice against" Plaintiff.

(Compl. (Dkt #1), ¶ 66). Plaintiff's Complaint lacks sufficient factual detail to plausibly allege the existence of a municipal policy or custom and cannot survive a motion to dismiss, much less a motion for summary judgment. See, e.g., Plair v. City of N.Y., 789 F. Supp.2d 459, 469 (S.D.N.Y. 2011) (finding that the plaintiff failed to state a plausible Monell claim where the complaint conclusorily alleged that the city "permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of plaintiff's beatings [which] constituted a municipal policy, practice or custom and led to plaintiff's assault"); Ying Li v. City of N.Y., No. 15-CV-1599(PKC), 2017 WL 1208422, at *35 (E.D.N.Y. Mar. 31, 2017) (similar).

Furthermore, Plaintiff's failure to raise a triable issue of fact as to any of his other constitutional claims is fatal to Monell claim. "Monell does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where . . . the policies or customs that it has sanctioned, led to an independent constitutional violation." Segal v. City of N.Y., 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original; citing Monell, 436 U.S. at 694 (municipal policy was "the moving force of the constitutional violation" asserted by the plaintiff); other citation omitted). Here, the Court has dismissed, as a matter of law, all of

Plaintiff's constitutional claims arising under § 1983. That there are no "independent constitutional violation[s]" to remedy in this case is an alternative basis for dismissal of Plaintiff's Monell claim. See, e.g., Mangino v. Inc. Vill. of Patchogue, 739 F. Supp.2d 205, 259 (E.D.N.Y. 2010) ("[B]ecause plaintiffs have not demonstrated any constitutional violations by the Fire Department defendants, there is no basis on which they could predicate Monell liability against the Fire Department. When plaintiffs lack any underlying claim of a deprivation of a constitutional right, the claim of municipal liability on the part of the municipal defendant must be dismissed as well.") (citing Segal, 459 F.3d at 219-20 (holding that district court did not need to reach municipal liability claim where due process claims failed); other citations omitted). Accordingly, Plaintiff's Seventh and Eleventh Causes of Action fail as a matter of law.

**E. State Law Claims**

"It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." Klein & Co. Futures v. Bd. of Trade of City of N.Y., 464 F.3d 255, 263 (2d Cir. 2006) (citing Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (noting that "'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will

point toward declining to exercise jurisdiction over the remaining state-law claims'")(quotation and further citation omitted)). None of the pertinent factors—judicial economy, convenience, fairness, and comity—favor the retention of jurisdiction over Plaintiff's state law claims. Accordingly, the Court dismisses them without prejudice. See Klein & Co. Futures, 464 F.3d at 262 (after district court dismissed claims under the federal Commodity Exchange Act for lack of standing, it declined to exercise jurisdiction over the plaintiff's supplemental state law claims and dismissed them without prejudice; circuit court affirmed).

## IV. Conclusion

For the foregoing reasons, the City Defendants' Motion for Summary Judgment is granted. The Complaint is dismissed in its entirety as to all of the defendants. The Clerk of Court is directed to close this case.

**SO ORDERED.**

**S/Michael A. Telesca**

_____
    HON. MICHAEL A. TELESCA
    United States District Judge

Dated:     August 4, 2017
             Rochester, New York.